UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRUSTEES OF THE HEAT AND FROST INSULATORS AND ALLIED WORKERS LOCAL 47 RETIREMENT TRUST FUND, *et al.*,

Plaintiffs,

Case No. 1:15-cv-540

v.

Hon. Ray Kent

INTERNATIONAL INSULATION FABRICATORS, INC. and ROBERT S. RUELL,

Defendants.
_____________________________________/

**OPINION**

This is an action to enforce collection of delinquent fringe benefit contributions pursuant to 29 U.S.C. § 1145 and 29 U.S.C. § 1132(g)(2). Compl. (docket no. 1, PageID.3, 5-6). This matter is now before the Court on plaintiffs' motion for partial summary judgment (docket no. 27) and defendants' motion for summary judgment (docket no. 30).

Plaintiffs are the Heat and Frost Insulators and Allied Workers Local 47(sometimes referred to as the "Union" and "Local 47"), and the Trustees of the following funds: Heat and Frost Insulators and Allied Workers Local 47 Retirement Trust Fund; Heat and Frost Insulators and Allied Workers Local 47 Welfare Fund; Heat and Frost Insulators and Allied Workers Local 47 Construction Industry Advancement Fund; Heat and Frost Insulators and Allied Workers Local 47 Joint Apprenticeship Trust Committee; Heat and Frost Insulators and Allied Workers Labor Management Cooperative Trust (collectively referred to as the "Funds"). Defendants are

International Insulation Fabricators, Inc. (sometimes referred to by the parties as "IIF" or "IIFI"), and Robert S. Ruell ("Ruell"), identified as the President, Secretary, Treasurer and Director of IIF. *See* Compl. at PageID.2-3.

Plaintiffs bring this action pursuant to § 1145, which provides that:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.

In addition, § 1132(g) provides in pertinent part that:

> (2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan --
>
> (A) the unpaid contributions,
>
> (B) interest on the unpaid contributions,
>
> (C) an amount equal to the greater of --
>
> (i) interest on the unpaid contributions, or
>
> (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
>
> (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
>
> (E) such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g)(2).

Plaintiffs have moved for partial summary judgment (docket no. 27), in which they seek an order as to liability, damages for the period of April 2014 through December 31, 2014 in the amount of $41,728.33, audit fees of $904.13, interest, and attorney's fees. Plaintiffs' Brief (docket no. 27, PageID.80). If this relief is granted, plaintiffs would proceed to trial to determine the amount of contributions owed to them for the period beginning January 1, 2015. *Id.*

Plaintiffs' claims arise from IIF's obligations as set forth in one or more collective bargaining agreements (CBAs) between Local 47 and the Master Insulators Association (sometimes referred to as the "Association"). According to plaintiffs, "[d]efendants do not dispute the audit calculations; their sole defense to this lawsuit is that IIF was no longer obligated to contribute to the Plaintiff Funds after sending its March 28, 2014 letter advising of an intent 'to terminate its contract' with Local 47." *Id.* at PageID.84. Plaintiffs further state that the narrow legal dispute to be resolved in this case and in their motion is:

> Did IIF have the legal authority to terminate its obligations under the CBA it conceded was fully in force on March 28, 2014 simply by sending a letter of intent? The answer is, unquestionably, "No".

*Id.* (emphasis omitted). Plaintiffs contend that defendant Ruell, while not the employer, is personally liable for the amount owed by IIF because the contributions became assets of the Funds when due, and "that individuals such as Defendant Ruell who have discretionary authority over plan assets are fiduciaries regarding those assets." *Id.* at PageID.90.

In their motion for summary judgment, defendants contend that they were not bound by any written agreement following the expiration of the July 10, 2010 CBA and that they have no further obligation to make any contributions after June 30, 2013 beyond those already made.

Defendants' Motion for summary judgment (docket no. 30). For their part, defendants state that issue as follows:

> Where defendant, International Insulation Fabricators, Inc., is not a member of an employer association, did not sign the March 1, 2013 CBA, and did not authorize any other party to sign a CBA on its behalf, is defendant obligated to make contributions to the plaintiffs['] funds?
>
> Answer: No.

Defendants' Brief (docket no. 31, PageID.208) (emphasis and uppercase lettering omitted).

**II. Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support

> plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

**III. Evidence presented by the parties**

IIF has never been a member of the Association. Ruell Aff. (docket no. 31-2, PageID.221). Nevertheless, the record reflects that in 2000, defendants adopted the CBA negotiated between Local 47 (known at that time as the Asbestos Workers Local Union # 47) and the Association by executing a one-page "Acceptance of Agreement" which provided in pertinent part:

> We, the undersigned, have read and hereby agree to be bound by all of the terms and conditions in the foregoing Agreement by and between the MASTER INSULATORS ASSOCIATION and the INTERNATIONAL ASSOCIATION OF HEAT AND FROST INSULATORS AND ASBESTOS WORKERS LOCAL #47 and hereby adopt the same and become one of the parties hereto.
>
> Signed this 18 day of October 2000.

*See* Acceptance (2000) (docket no. 27-2, PageID.100). Seven years later, on August 29, 2007, defendants executed another one-page Acceptance of Agreement between Local 47 and the Association. *See* Acceptance (2007) (docket no. 27-3, PageID.102).

In his affidavit, Ruell acknowledges that IIF also signed a CBA between Local 47 and Association which was in effect from July 1, 2010 through June 30, 2013. Ruell Aff. at PageID.221; CBA (July 1, 2010 through 2013) (docket no. 31-3, PageID.225-294).

In January 2013, Local 47 requested that Ruell sign an Interim Agreement reached between Local 47 and the Association. Local 47 Letter (Jan. 17, 2013) (docket no. 31-4,

PageID.295). The proposed Interim Agreement provided in part that "By signing this Interim Agreement the Employer is assured that Local 47 will not engage in a lawful picket or strike against the Employer in the event Local 47 does not settle a new Collective Bargaining Agreement with the Association by Midnight, June 30, 2013." *Id.* at PageID.296.

Although the July 1, 2010 CBA did not expire until June 30, 2013, Local 47 entered into a new ten-year agreement with the Association which was effective from March 1, 2013 through June 30, 2023. *See* CBA (March 1, 2013) (docket no. 27-4). In an undated "Memorandum," the Union's Business Manager/Financial Secretary advised IIF in pertinent part as follows:

> Our records indicate that you have not signed Local 47's Acceptance of Agreement for the new Contract that became effective March 1, 2013. Please sign the attached form and return it to the Local Union office . . .

Memo (undated) (docket no. 27-5). There is no evidence that defendants ever signed the March 1, 2013 CBA.

Ruell's affidavit set forth the following chronology:

5. On each occasion in the last 15 years, during which a CBA was negotiated and entered into between the Union and Master Insulators Association, IIFI was presented with the CBA, <u>subsequent</u> to negotiations, and given the opportunity to execute an acceptance of it.

6. Effective July 1, 2010, IIFI signed its last CBA with the Union. This was a CBA in effect from July 1, 2010 through June 30, 2013.

7. By its terms as I read them, the last CBA remained in full force and effect until its termination date of June 30, 2013.

8. As I read the terms of the July 1, 2010 CBA, in order to renew, in its current form or with changes or amendments, either party was required to "make known its intentions in writing at least ninety (90) days prior to its expiration."

9. On or about January 17, 2013, IIFI received a letter from the Untion with an attached Interim Agreement, notifying IIFI of upcoming contract negotiations.

10. IIFI refused to sign the Interim Agreement. It was my intention that IIFI was not to be a signatory to any further CBAs. Business was terrible and there was no way that IIFI could afford to be in the Union.

11. Neither the Union's cover letter to me in January 2013 nor the Interim Agreement attached to the Union's letter gave any indication that the July 1, 2010 CBA would be replaced prior to the June 30 expiration date with a new ten year CBA.

12. I talked to the Union a number of times in late 2013 and early 2014, I [sic] let the Union know IIFI could no longer afford to be in the CBA. I was advised to write the Union and confirm my intention.

13. I sent the Union a letter on March 28, 2014 advising the Union IIFI could no longer continue with the terms of the last CBA (See attached).[1]

14. In 2013, while the 2010 Collective Bargaining Agreement was still in effect, IIFI was a contractor on a union scale wage job at McLaren Hospital. The McLaren Hospital job continued after the expiration of the July 1, 2010 CBA.

15. IIFI continued to make contributions to the Union Funds for union scale wages paid on the McLaren Hospital job until the job was completed.

16. Other than the contributions for the aforementioned job which began prior to June 30, 2013, and until the completion of the job in the fall of 2013, IIFI made no contributions to Plaintiff Funds.

* * *

18. It was not until February 2015 that IIFI has record of receiving a copy of the new CBA. Prior to receiving the copy of the new CBA, IIFI received a memorandum from the Union asking IIFI to sign an

[1] The Court notes that this letter was not attached to the affidavit or as an exhibit to defendants' brief. A copy of this letter appears in plaintiffs' submissions as docket no. 27-8.

> acceptance of the new ten year CBA that IIFI had no record of receiving at that point. This notice consisted of an undated letter and an attached signatory page. (See attached [docket no. 31-5]).
>
> 19. I refused to sign the acceptance on behalf of IIFI.

Ruell Aff. (docket no. 31-2, PageID.221-223) (emphasis in original).

Consistent with Ruell's statements regarding the additional work on the McLaren Hospital job in 2013, defendants executed various documents with the Union until December 2013. On July 23, 2013, defendants executed a "Cash Bond" in which IIF was the principal, and indebted to the Union and Funds "in the sum of $4,000.00 for each Employee of the Principal up to a maximum of $40,000.00." Cash Bond (docket no. 27-2). IIF also submitted "Employer's Reports" to the "Heat and Frost Insulators and Allied Workers Local 47 Fringe Benefit Funds" during 2013. The fringe benefit contributions indicated the following hours worked and benefit contributions made during 2013: August 2013 (12 hours / $253.08); September 2013 (32 hours / $674.88); October 2013 (0 hours / $0); November 2013 (40 hours / $843.60); December 2013 (0 hours / $0). *See* Employer's Reports (docket no. 27-6).

In the letter dated March 28, 2014, addressed to "Heat and Frost Insulators & Allied Workers Local 47," Ruell, in his capacity as IIF's President stated:

> International Insulation Fab. Inc. is writing this letter to inform our intention to terminate its contract with the Heat and Frost Insulators & Allied Workers Local 47.

Ruell Letter (March 28, 2014) (docket no. 27-8).

The Union's Business Manager, Craig Grigonis ("Grigonis") submitted an affidavit regarding his interactions with Ruell during 2014 setting forth the following facts. Ruell contacted Grigonis by telephone sometime in 2014 and made a statement to the effect that "I'm not going to

be union anymore." Grigonis Aff. (docket no. 34-2, PageID.321). Grigonis characterized Ruell's statement as ambiguous:

> 3. I was unsure as to the meaning of this statement, since Mr. Ruell was himself a member of Local 47, and his company, International Insulation Fabricators, Inc., was a signatory employer with Local 47. Thus, I was unsure whether he meant that he was personally resigning his membership in Local 47, or was speaking with respect to his Company, or both. I acknowledged his statement, and assumed that he would follow up with a letter clarifying his intent.

*Id.*

Although Grigonis is "now aware that Mr. Ruell claims he sent a letter to Local 47 dated March 28, 2014," Grigonis "did not receive any such letter from him at that time." *Id.* Rather, Grigonis "became aware of the letter he claims he sent only after a dispute arose with International Insulation Fabricators, Inc. concerning unpaid contributions to Local 47 Pension, Welfare and other fringe benefit funds." *Id.* Grigonis also stated that "I did not direct Mr. Ruell to send the letter, and I am not aware of any other Local 47 representative doing so." *Id.*

Grigonis further stated:

> 5. The conversation I had with Mr. Ruell concerning his ambiguous desire "not to be union anymore" came long after the current collective bargaining agreement ("CBA") took effect in March 2013. The conversation was also long after the previous CBA, which was replaced in March 2013. would have expired by its own terms in July 2013.
>
> 5. The conversation with Mr. Ruell also came long after International Insulation Fabricators, Inc. had continued its past practice of making contributions to the Local 47 fringe benefit funds during the period covered by the current CBA, which took effect March 2013.
>
> 6. Mr. Ruell did not advise me verbally, in writing, or otherwise, that International Insulation Fabricators, Inc. intended to terminate its status as a Local 47 employer and contributor to Local 47's fringe

> benefit funds until sometime in 2014, after it had already accepted by its actions the 2013 CBA and had fulfilled its obligations under the 2013 CBA by making contributions to the various Local 47 fringe benefit funds.

*Id.* at PageID.321-322.[2]

Finally, plaintiffs submitted a File Audit Report for the year 2014 for the "Ferris State Job." File Audit Report (docket no. 27-9). The audit indicated that IIF owed $41,728.33 in contributions and dues, and a "cost of audit" in the amount of $904.13, for a total amount due of $42,632.46. *Id.* The audit report does not include any contributions due for the months of January, February and March, 2014. *Id.* at PageID.124. All of the delinquent contributions were for the months of April through December, 2014. *Id.* The billing date for the audit was February 9, 2015. *Id.* at PageID.123.

Based on the record in this case, the Court concludes that there is no genuine issue of material fact with respect to the following: (1) defendants were not members of the Association at any time relevant to this dispute; (2) defendants adopted the terms of a CBA between Local 47 and the Association which commenced on July 1, 2010 and expired on June 30, 2013; (3) defendants did not adopt or sign the Interim Agreement submitted to them in January 2013; (4) defendants did not adopt or sign the March 1, 2013 CBA between Local 47 and the Association; (5) defendants executed a cash bond for the benefit of Local 47 and the Funds in July 2013; (6) defendants submitted employer's reports for fringe benefit contributions related to 84 hours of work performed in August, September, October, November and December 2013; (7) defendants' employer reports involved work done on the McLaren Hospital Job which had started in 2013, while the July 1, 2010

---

[2] The Court notes that the Grigonis affidavit contains two paragraphs numbered "5".

CBA was still in effect; (8) Ruell had at least one telephone call with Grigonis in 2014 expressing an intent to discontinue either his personal membership in Local 47, IIF's participation as an employer with Local 47, or both; (9) Ruell did not advise Grigonis of IIF's intention to terminate its status as a Local 47 employer until sometime in 2014; (10) in a letter dated March 28, 2014, Ruell sent a letter to Local 47 expressing IIF's intention to terminate its contract with Local 47; (11) the audit report reflects that the employer, IIF, did not owe any fringe benefit contributions for the months of January, February and March, 2014; and (12) the audit report reflects that the employer, IIF, owed fringe benefit contributions for the months of April, May, June, July, August, September, October, November and December 2014.

## IV. Discussion

Plaintiff's claim arises from defendants' obligation to make employee fringe benefit contributions pursuant to a CBA with Local 47. The legal framework for addressing such claims was set forth by the Sixth Circuit in *Board of Trustees of the Plumbers, Pipe Fitters & Mechanical Equipment Service, Local Union No. 392 Pension Fund v. B & B Mechanical Services, Inc.*, 813 F.3d 603(6th Cir. 2015), which stated in pertinent part:

> Both the Employee Retirement Income Security Act (ERISA) and the [Labor Management Relations Act] LMRA require that agreements concerning employee fringe benefit plans be maintained in writing in order to avoid misunderstandings and prevent abuse. One of ERISA's "core functional requirements" is that each "employee benefit plan shall be established and maintained pursuant to a written instrument." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995) (quoting 29 U.S.C. § 1102(a)(1)). Every employee benefit plan must "specify the basis on which payments are made to and from the plan," 29 U.S.C. § 1102(b)(4), and "[t]he plan administrator is obliged to act 'in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with'" ERISA provisions. *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 300, 129 S.Ct. 865, 172 L.Ed.2d 662 (2009) (quoting 29 U.S.C. § 1104(a)(1)(D)).

> Written plans are necessary because LMRA § 302(a) generally bars employers from contributing money or a thing of value to representatives of employees. 29 U.S.C. § 186(a). This statutory prohibition exists to prevent the misappropriation or dissipation of money that is owed to union employees. *Cent. States, Se. & Sw. Areas Pension Fund v. Behnke, Inc.*, 883 F.2d 454, 459 (6th Cir.1989). To protect fringe benefits, an exception exists in § 302(c)(5)(B) of the LMRA authorizing employers to make contributions to trust funds established by employee representatives "for the sole and exclusive benefit of the employees," if "the detailed basis on which such payments are to be made is specified in a written agreement with the employer." 29 U.S.C. § 186(c)(5)(B).
>
> Under such written agreements, the multi-employer fringe benefit trust funds become third-party beneficiaries and, under § 515 of ERISA, they may rely on the literal terms of the written agreements. 29 U.S.C. § 1145; *Operating Eng'rs Local 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1051 (6th Cir.2015). Section 515 protects and streamlines a trust fund's ability to collect an employer's delinquent contributions owed to an ERISA employee benefit plan by limiting the employer's assertion of "unrelated" or "extraneous" defenses, *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 88 & n. 12, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982), and by rendering immaterial the actual intent of the bargaining parties or any understandings those parties may entertain separate and apart from the written agreements. *Bakery & Confectionery Union & Indus. Int'l Health Ben. & Pension Funds v. New Bakery Co.*, 133 F.3d 955, 959 (6th Cir.1998). Thus, § 515 "increases the reliability" of the income stream of multiemployer funds, "reduces the cost and delay associated with collection actions, and reduces or eliminates the cost of monitoring the formation of collective bargaining agreements." *Id.* (quoting *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021-22 (6th Cir.1997)).

*B & B Mechanical Services, Inc.*, 813 F.3d at 608-09.

While an employer's fringe benefit contributions arise from a written agreement, an employer may be bound to that agreement by an agent. *See id.* at 610 ("[w]e have held that § 302(c)(5)(B) is satisfied if the 'written agreement' binding an employer to make contributions to trust funds is signed by the contractors' association on behalf of the employer, even if the employer did not give the association express written authority to act on its behalf"); *National Leadburners Health & Welfare Fund v. O.G. Kelley & Co.*, 129 F.3d 372, 375-76 (6th Cir. 1997) (after

recognizing "a well-developed body of law allowing employer associations to bind employer members to collective bargaining agreements," the court conclude that "the statute is satisfied by a written agreement to which an employer is bound, not a written agreement to which an employer is bound which also carries that employer's signature").

In addressing disputes regarding an employer's obligation to make fringe benefit contributions, the Sixth Circuit also applies "a longstanding rule that the 'written agreement' required by LMRA § 302(c)(5)(B) does not have to be a CBA as long as the written agreement 'sets out the employer's obligation to contribute' to the employee benefit funds. *Behnke, Inc.*, 883 F.2d at 459 (quoting *Cent. States Se. & Sw. Areas Pension Fund v. Kraftco, Inc.*, 799 F.2d 1098, 1111 n. 16 (6th Cir.1986))." *B & B Mechanical Services, Inc.*, 813 F.3d at 609. However, where an employer neither signs a written agreement nor has an authorized agent sign such an agreement, the employer's intent to be bound by the fringe benefit provisions of the written agreement may not be inferred from the employer's conduct alone. For example, in *Merrimen v. Paul F. Rost Electric, Inc.*, 861 F.2d 135, 137 (6th Cir. 1988), although the employer maintained membership in an employer association and voluntarily made pension contributions for employees for a period of time, the court declined to hold the employer bound to the CBA based solely on this conduct because the employer did not sign the letter of assent to be bound by the CBA as expressly required by the CBA. *See Merrimen*, 861 F.2d at 139 ("this Court declines to hold that an employer which never signed its assent to a CBA is bound to make pension contributions in accordance therewith merely because it did so voluntarily for a time"). As the Sixth Circuit explained in *O.G. Kelley & Co.*:

> In *Merrimen*, this court held that an employer's assent to be bound by the pension provisions of a collective bargaining agreement could not be inferred from conduct alone where the employer indisputably did not adopt or promise to adopt the

> agreement in any form of writing and where the collective bargaining agreement required a signature in order to bind an employer.

*O.G. Kelley & Co.*, 129 F.3d at 374-75.

Finally, where an employer fails to sign a new CBA, but demonstrates an intent to be bound to the expired CBA, that employer is bound by the terms of the expired CBA until the employer ceases to demonstrate such intent. As the Sixth Circuit explained:

> An employer's intent to be bound by the benefits fund provisions of a collective bargaining agreement cannot be inferred when the employer has not signed a collective bargaining agreement. *Merrimen v. Paul F. Rost Elec., Inc.*, 861 F.2d 135 (6th Cir.1988). An expired, signed collective bargaining agreement, however, may continue to bind an employer if the employer demonstrates an intent to continue to be bound. *Central States, Southeast and Southwest Areas Pension Fund v. Behnke, Inc.*, 883 F.2d 454, 461 (6th Cir.1989); *see also Robbins v. Lynch*, 836 F.2d 330 (7th Cir.1988).

*Michigan Bricklayers & Allied Craftsmen Health Care Fund v. Northwestern Construction, Inc.*, Nos. 95-2379 and 96-1346, 1997 WL 351296 at *3, 116 F.3d 1480 (6th Cir. 1997) (unpublished decision).

Here, it is undisputed that defendants adopted the July 1, 2010 CBA and that they did not sign the March 1, 2013 CBA. Because IIF was not an employer member of the Association, it was not bound by the CBAs negotiated by the Association under an agency theory. As discussed, *supra*, defendants agreed to the July 1, 2010 CBA by signing a separate "Acceptance of Agreement." This is consistent with the July 1, 2010 CBA, which provided in pertinent part:

> THIS AGREEMENT, made and entered into, by and between the MASTER INSULATORS ASSOCIATION, hereinafter called the "Association" on behalf of its members and other contractors performing work within the insulating industry who elect to become signatory to this Agreement, hereinafter called the "Employers" and the INTERNATIONAL ASSOCIATION OF HEAT AND FROST INSULATORS AND ALLIED WORKERS LOCAL #47, hereinafter called the "Union." <u>This Agreement shall be considered equally binding on the individual</u>

> Association members, those other Employers who elect to become signatory to this Agreement and the Union body as a whole. The Association shall notify the Union of termination, withdrawal or suspension of any Employer members within forty-eight (48) hours of such termination, withdrawal or suspension.
>
> * * *
>
> ARTICLE XXVII
> **TERMINATION**
>
> This Agreement shall become effect July 1, 2010 and shall remain in full force and effect until its termination date of June 30, 2013.
>
> Either party to this Agreement desiring to renew it in its present form or with changes and/or amendments shall make known such intentions in writing at least ninety (90) days prior to its expiration date of June 30, 2013.

July1, 2010 CBA (docket no. 31-3, PageID.234, 264) (emphasis added).

While defendants submitted a cash bond for fringe benefits in July 2013 and reported 84 hours of work performed from August through December, 2013, these actions were not a substitute for signing the March 1, 2013 CBA. *See Merrimen*, 861 F.2d at 137, 139. Rather, defendants' actions demonstrated their intent to continue to be bound by the terms of the expired July 1, 2010 CBA. *See Northwestern Construction, Inc.*, 1997 WL 351296 at *3.

The next question is when defendants ceased to "demonstrate[] an intent to continue to be bound" by the July 1, 2010 CBA. In his affidavit, Ruell stated that "I sent the Union a letter on March 28, 2014 advising the Union IIFI could no longer continue with the terms of the last CBA." Ruell Aff. at PageID.222; Ruell Letter (March 28, 2014). For his part, Grigonis admitted that Ruell advised him that the corporation "intended to terminate its status as a Local 47 employer and contributor to Local 47's fringe benefit funds . . . sometime in 2014." Grigonis Aff. at

PageID.322. This evidence demonstrates that Ruell expressed an intent to terminate IIF's status as an employer subject to the CBA in 2014, and that he signed a letter to that effect on March 28, 2014. While Grigonis denies that he received such a letter, there is no evidence to contradict that (1) such a letter existed, and (2) Ruell's statement that he sent it to Local 47. Based on this record, the Court concludes that defendants were not bound to make fringe benefit contributions under the terms of the March 1, 2013 CBA, but that they were bound to make contributions under the terms of the expired July 1, 2010 CBA until March 28, 2014.

Plaintiffs' complaint seeks relief under the March 1, 2013 CBA for contributions and fees owed in 2014 and for an undetermined amount of contributions due since January 2015. For the reasons discussed, defendants did not adopt the March 1, 2013 CBA and were not liable for contributions due under that agreement. While defendants were obligated to submit contributions under the expired July 1, 2010 CBA until March 28, 2014, the record reflects that they performed this obligation. Defendants submitted employer's reports for contributions due from July through December 2013, and plaintiffs do not seek any damages for contributions due in January, February or March, 2014. As discussed, the audit report does not show any delinquent contributions for the months of January through March, 2014, and plaintiffs' motion for partial summary judgment is limited to contributions due after that date, seeking "damages for the period April 2014 through December 31, 2014 in the amount of $41,728.33, plus audit fees of $904.13, interest and attorney fees." Defendants' Brief at PageID.80.

## IV. Conclusion

Accordingly, plaintiffs' motion for partial summary judgment (docket no. 27) is **DENIED** and defendants' motion for summary judgment (docket no. 30) is **GRANTED**. An order and judgment consistent with this opinion shall be issued forthwith.

Dated: January 19, 2017

/s/ Ray Kent
RAY KENT
United States Magistrate Judge